UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Z.W., through her guardian Ad Litem Crystal Christman; SHERMAN WATSON, individually and as representative of the estate of SHAWN LAMOND WATSON; CATHERINE THOMPSON, individually and as representative of the estate of SHAWN LAMOND WATSON, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN BERNARDINO; and OFFICER JONATHAN PLUMMER, <br><br> Defendants | Case No. EDCV 09-1846 VAP (DTBx) <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL [Fed. R. Civ. P. 52] |

        This case was tried to the Court on December 7 and 8, 2010, and the

Court deemed the matter submitted.  Having considered all the evidence

presented by the parties, as well as the arguments and briefing by counsel,

1   the Court makes the following Findings of Fact and Conclusions of Law

2   pursuant to Federal Rule of Civil Procedure 52.[1]

3

4                      **I.  FINDINGS OF FACT[2]**

5   **A.    The Parties**

6   1.     Plaintiff  Z.W. is the minor daughter of decedent Shawn Lamond

7          Watson ("Watson").  She appears in this action by and through her

8          duly-appointed guardian ad litem, Crystal Christman.  Plaintiff Sherman

9          Watson is Watson's father, and Plaintiff Catherine Thompson is

10         Watson's mother.  (Pretrial Conference Order ("PTCO") ¶ 6 (c) - (e);

11         Doc. No. 71 (Plaintiffs' Memorandum of Contentions of Fact & Law

12         ("Pls.' Mem.")) at 1-2.)

13  2.     Defendant City of San Bernardino, a public entity, employed Defendant

14         Jonathan Plummer ("Plummer") as a police officer on June 10, 2007.

15         (Doc. No. 48 (Defendants' Memorandum of Contentions of Fact & Law

16         ("Defs.' Mem.")) at 1.)  Defendant Plummer was acting within the

17         course and scope of his employment and under color of state law at all

18         times relevant to this action.  (PTCO ¶ 6 (a), (b).)

19

20  **B.    Events of June 10, 2007**

21  3.     At approximately 11:30 p.m. on June 10, 2007, San Bernardino Police

22         Officers Eddie Flores ("Flores") and Jonathan Plummer arrived at the

23         Ascot Apartments complex in the City of San Bernardino.  Both Flores

24         and Plummer were familiar with the complex because they had been

25

26         [1] Neither side submitted Proposed Findings of Fact & Conclusions of Law as required under Local Rule 52-1.

27         [2] To the extent any of the Findings of Fact more properly should be

28  considered Conclusions of Law, they shall be deemed as such.

dispatched to that location on many occasions.  They considered it a high-crime area based on their past experience investigating crimes there, including homicides and other serious felonies.  Defendant Plummer had been employed as an officer with the San Bernardino Police Department for approximately four years as of that night.

4.  The officers went to the Ascot Apartments on routine foot patrol; they were also there to obtain information about a probationer, and as part of an ongoing investigation into the whereabouts of a suspect, for whom there was an outstanding arrest warrant on a homicide charge. (Trial Exs. 168, 169.)

5.  After they arrived, parked their separate police cars, and began to walk into the complex grounds, the officers saw a gathering of about ten African-American men.  These men dispersed immediately upon seeing the police officers.  When Defendant Plummer saw one of the men toss to the ground a metal object he thought sounded like a gun, Defendant Plummer yelled "Police" and began chasing that person.  Defendant Plummer called dispatch and reported the pursuit, and as he ran, he heard gunshots.

6.  At the same time Defendant Plummer was pursuing the first subject, Officer Flores recognized Watson among the men gathered in the complex, and began chasing him.  The two officers passed one another a minute or two later; although Officer Flores did not have a chance to tell Officer Plummer the identity of the person he was pursuing (i.e., Watson), Plummer knew Flores was pursuing a subject as well. Officer Flores did yell to Officer Plummer to "be careful" because "shots were being fired at [the officers]."  Both officers described the scene as

1   "very chaotic," because of the number of persons scattering and the
2   gunshots fired.

3   7.   After passing Officer Flores, Defendant Plummer rounded the corner of
4        Building H and suddenly saw a person, later identified as Watson,[3]
5        crouched near the shrubbery.

6   8.   Defendant Plummer yelled "Police! Freeze!" to Watson.  Watson was at
7        least ten to fifteen feet away from Defendant Plummer, and Defendant
8        Plummer saw Watson "fiddling" with a dark object near his waistband
9        that looked like a firearm.  Plummer was startled to see Watson
10       crouched outside the apartment building; the officer explained he was
11       surprised because Watson was the only person in the area when all
12       others outside were running away, and the apartment complex
13       residents would be likely to give haven inside their apartments to one
14       seeking to hide from police officers.

15   9.   Watson said nothing in reply to Defendant Plummer's command to
16        "Freeze!," and did not stop what he was doing with the dark object in or
17        near his waistband; instead, he turned partly around and "engaged" or
18        made eye contact with Defendant Plummer.  Plummer fired two shots
19        from his Heckler & Koch service weapon; one struck Watson in the
20        back of his head and the other struck him in his back.

21   10.  At the moment he fired, Defendant Plummer thought Watson was about
22        to shoot at him.

23   11.  Shortly before Defendant Plummer fired shots at Watson, Officer Flores
24        heard Defendant Plummer yelling, and then heard two shots fired.
25        Officer Flores did not know who had fired the shots; he peered around

26

27        _____
28        [3] Defendant Plummer did not know Watson's identity until after the
     shooting.

4

1   the south east corner of Building H, and heard Defendant Plummer
2   reporting over his radio that he had fired shots.  Officer Flores did not
3   see Watson holding a weapon or dropping one.

4   12.   After the shooting, San Bernardino Police Department officers searched
5         the vicinity and found a 9 mm Browning Arms handgun in the shrubbery
6         between Watson's body and the apartment building.  A fragment of a
7         black plastic replica handgun was found a few feet away from Watson's
8         body.  A Davis Industries .380 caliber handgun was found in the
9         driveway adjacent to Building E, with a live round of ammunition in the
10        breach.  A Walther Model PPKS BB pistol was recovered from the
11        parking lot adjacent lot to Building E, as well as additional fragments of
12        the black plastic replica handgun, and a magazine containing .380
13        caliber ammunition.  Officers discovered bullet strikes to the wall on the
14        west driveway and expended .45 caliber bullet casings as well.  (Tr. Ex.
15        16.)  A small pink colored pill was found in the palm of Watson's right
16        hand after the shooting.  (Tr. Ex. 2-K.)  No weapon was found on
17        Watson's body.

18  13.   Defendant Plummer saw something fly out of, or drop from, Watson's
19        right hand immediately after the shooting.

20  14.   Defendant Plummer carried one service weapon that night, a 9 mm
21        Heckler & Koch, from which two rounds were fired the night of June 10,
22        2007.  An expended 9 mm shell casing was found on the walkway east
23        of Building H.  (Tr. Ex. 19.)

24  15.   According to San Bernardino Police Detective O'Neal, who was the
25        homicide investigator called to the scene of the Watson shooting, it is
26        routine procedure to test a shooting subject's body for gun shot residue,
27        but no such testing was performed on Watson's body in this case.

28

5

1  Detective O'Neal could not explain why the testing was not performed
2  on Watson's body.

3  16.  Dr. Glenn Holt, a deputy medical examiner with the County of San
4  Bernardino Coroner's office, performed the autopsy on Watson's body.
5  He testified that the bullet found in Watson's head would have rendered
6  Watson unconscious right away, and the victim would not have been
7  capable of making any voluntary movements after the bullet's impact.
8  That bullet entered the back of the cranial cavity 37 centimeters (5.5
9  inches) from the top of Watson's head, and the other entered his back
10  37 centimeters (14.6 inches) from the top of his head.  Dr. Holt opined
11  that Watson was bent forward slightly at the time of the impact of the
12  first bullet.

13  17.  Lavontae Moten was thirteen years old on the night of the shooting.  He
14  lived in Building C of the Ascot Apartment complex, and was
15  interviewed by Sergeant Timothy Crocker of the San Bernardino Police
16  Department the morning after the shooting.  Moten did not obey a trial
17  subpoena to appear and testify at trial, and the Court deemed him
18  unavailable as a witness and allowed both parties to present selected
19  portions of his deposition testimony.  The Court also admitted his
20  videotaped police interview into evidence.

21  18.  Moten has a "really bad" memory, caused in part by his attention deficit
22  hyperactivity disorder.  (Moten Dep. 100:5-7.)  Nevertheless, his
23  testimony, while vague in some respects, and contradictory at times,
24  corroborated some of the testimony of Officers Plummer and Flores
25  regarding the events at the Ascot Apartments on June 10, 2007.

26  19.  Moten first told Detective Crocker he had seen a number of men
27  running, police officers pursuing them, and then sounds like

28

6

1   "firecrackers."  This is consistent with the police officers' testimony that
2   they heard gunshots fired as they each pursued suspects when the
3   crowd of men dispersed.  During the police interview, Moten said had
4   said he had witnessed the events, from beginning to end, outside his
5   apartment.  Later, Moten admitted this was not truthful, and testified in
6   his deposition that he had been visiting his girlfriend at her apartment
7   within the complex and heard nothing at all — no one shouting, no one
8   running, no gunshots – until he was on the stairs outside her apartment
9   building, when he heard someone say "Put your hands up" and saw
10  Shawn Watson running in his direction, with a police officer in pursuit.
11  (Moten Dep. 49:15-25; 54:17-25; 55:1-2; 131:8-10.)

12  19.  Moten contradicted this testimony when he later claimed he first saw
13       the police officers at the time they arrived at the Ascot Apartments
14       complex.  (Moten Dep. 128:13-25; 129:1-2.)  Moten testified that the
15       officer who shot Watson was Caucasian, or perhaps Hispanic, and
16       reiterated that statement several times.  (Moten Dep. 159:23-25; 160:1-
17       6; 165:8-18.)  Officer Plummer is African American and could not be
18       mistaken for Caucasian or Hispanic.  Officer Plummer consistently has
19       admitted he fired the shots at Watson and the forensic evidence
20       corroborates this, as two rounds were fired from his Hechler & Koch
21       service weapon that night.  Officer Flores was carrying two handguns, a
22       9 mm Glock and a Hechler & Koch, and both were fully loaded when
23       inspected after the shooting.

24  20.  Moten described seeing the officer to whom he ascribed Watson's
25       shooting peering around Building H, with his firearm drawn,
26       immediately before the shooting.  Officer Flores testified that when he
27       heard the shots fired by Officer Plummer – but did not know who had

28

7

fired – he drew his weapon and peered around the corner of Building H, before approaching the scene of the shooting.  Taking all of the testimony in context, the most plausible explanation of Moten's testimony is that Moten saw Flores, a Hispanic officer, peering around the building before Watson was shot.  The Court does not find credible Moten's testimony that he witnessed the shooting itself, given his contradictory statements about whether he saw the actual shooting, where he was standing at the time of the shooting, the number of shots fired, what he could see from his vantage point, and the shooting officer's appearance.

## CONCLUSIONS OF LAW

**A.**   **Jurisdiction**

1.   The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction).  Personal jurisdiction exists over Defendants because they reside in San Bernardino County, California, within the Central District of California and the Eastern Division thereof.  (PTCO ¶ 3.)  Venue is properly laid in the Central District of California under 28 U.S.C. § 1391(b) because the claims arose in the Central District of California, Eastern Division.  (Id.)  Federal jurisdiction and venue are admitted.  (Id.)

2.   Both sides waived their right to jury trial.  (See Doc. No. 76 (Dec. 2, 2010, Order Re Motions in Limine and Request for Jury Trial.)

**B.    Claim Under 42 U.S.C. § 1983 for Violations of Watson's Right Under the Fourth Amendment to Be Free From Unlawful Seizure**

3.    The first claim is brought only by Plaintiff Z.W.  To recover under section 1983 for a Fourth Amendment violation, Plaintiff Z.W. must prove by a preponderance of the evidence that (1) Defendant Plummer acted under color of state law; and (2) the acts of Defendant Plummer deprived decedent Shawn Watson of his right under the Fourth Amendment to be free from unreasonable seizure.

4.    Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of his person.  To prove Defendant Plummer deprived decedent of this Fourth Amendment right, Plaintiff must prove: (1) Defendant Plummer seized Watson; (2) in seizing Watson, Defendant Plummer acted intentionally; and (3) the seizure was unreasonable.

5.    Plaintiff Z.W. carried her burden of proof as to the first two elements; there was no dispute that Defendant Plummer shot Watson twice, thus "seizing" him within the meaning of the Fourth Amendment, nor that he did so intentionally.

6.    To satisfy the third element, Plaintiff Z.W. must prove that Defendant Plummer did not have probable cause to believe Watson posed an imminent threat of death or serious bodily injury to Defendant Plummer or to others.

7.    All excessive force claims under the Fourth Amendment, including deadly force claims, should be analyzed under the objective reasonableness standard set forth in Graham v. Connor, 490 U.S. 386 (1989), Tennessee v. Garner, 471 U.S. 1 (1985), and Scott v. Harris, __ U.S. __, 127 S. Ct. 1769 (2007).  In deciding whether Plaintiff Z.W.

proved by a preponderance of the evidence that Defendant Plummer used excessive force in this case, the Court determines whether the officer used only such force as was "objectively reasonable" under all of the circumstances, judging the reasonableness of the particular use of force from the perspective of a reasonable officer on the scene and not "with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396-97. "[T]here is no special Fourth Amendment standard for unconstitutional deadly force . . . Instead, 'all that matters is whether [the police officer's] actions were reasonable.'"  Acosta v. Hill, 504 F.3d 1323, 1324 (9th Cir. 2007) (citing Scott, 127 S. Ct. at 1777-78).

9.   A court should consider the totality of the facts and circumstances in a particular case in deciding whether the force used to effect a particular seizure under the Fourth Amendment was reasonable, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Blanford v. Sacramento, 406 F.3d 1110, 1115 (9th Cir. 2005) (citation omitted); see Jackson v. City of Bremerton, 268 F.3d 646, 652 (9th Cir. 2001).  The Court finds the following circumstances were present and known to Defendant Plummer in this case:

- Defendant Plummer and his fellow officer, Officer Flores, went to the Ascot Apartments complex shortly before midnight on June 10, 2007, to investigate the whereabouts of a suspect, for whom an arrest warrant on a first degree murder charge had been issued (among other reasons);

10

- Defendant Plummer was familiar with the Ascot Apartments complex because he had been called there at least twenty times in connection with serious crimes, including narcotics and violent crimes; Officer Plummer regarded that location as a "high-crime" area;

- When Officers Plummer and Flores arrived at the complex, they immediately observed a gathering of about ten African-American men who dispersed as soon as they saw the police officers; Officer Plummer saw one of those men throw to the ground something that sounded like a metal firearm;

- During his foot pursuit of the man who threw the object to the ground, Defendant Plummer heard gunshots, and when he encountered Officer Flores a minute or two later during the latter's own foot pursuit of another man, Flores warned Plummer to be careful because gunshots had been fired;

- When Defendant Plummer rounded the corner of Building H in the complex and encountered Watson crouching near the outdoor staircase and shrubbery next to the building, Defendant Plummer was startled to see Watson; Officer Plummer found it unusual that Watson had not entered one of the apartments as had the other fleeing men;

- Watson was facing away from Defendant Plummer, at a slight angle; Defendant Plummer thought that Watson appeared to have

11

a dark metal object, which appeared to be a firearm, in his hands or waistband; Watson was "fiddling with" the dark object;

- Defendant Plummer warned Watson that he was a police officer and commanded him to "Freeze," but Watson did not obey Plummer's command; Watson continued to fiddle with the dark metal object and turned his head in Plummer's direction; and

- These events took place in a "chaotic" atmosphere and within a short period, during which Defendant Plummer heard gunshots fired; less than five minutes elapsed between the time the officers arrived at the complex and when Defendant Plummer fired two shots at Watson.

10.   In light of these circumstances, Plaintiff has not met her burden of proving by a preponderance of the evidence that Officer Plummer used excessive force when he fired two deadly shots at Watson.

## C.   Claim Under 42 U.S.C. § 1983 for Violations of Plaintiffs' Rights Under the Fourteenth Amendment to Be Free From Undue State Interference With Familial Relations

11.   To prevail on their claim for violation of their Fourteenth Amendment due process liberty interest in companionship and society with the decedent Shawn Watson, Plaintiffs Sherman Watson, Catherine Thompson, and Z.W. must prove each of the following elements by a preponderance of the evidence:  (1) Defendant  Plummer acted under color of state law; (2) Defendant Plummer's conduct "shocks the

1   conscience"; and (3) Defendant Plummer's conduct caused Watson's

2   death.  There is no dispute as to the first and third elements, and the

3   Court finds Plaintiffs have met their burden as to them.

4   12.   As to the second element, to decide whether a defendant's conduct

5         "shocks the conscience," the Court first must determine whether the

6         circumstances when Defendant Plummer acted were such that "actual

7         deliberation" by the officer was practical.  Wilkenson v. Torres, 610 F.3d

8         546, 554 (9th Cir. 2010).  "[W]here actual deliberation is practical, then

9         an officer's deliberate indifference may suffice to shock the conscience,

10        but, on the other hand, where a law enforcement officer makes a snap

11        judgment because of an escalating situation, his conduct may only

12        found to shock the conscience if he acts with a purpose to harm

13        unrelated to legitimate law enforcement objectives."   Id. (citing Porter v.

14        Osborn, 546 F.3d 1131,1140 (9th Cir. 2008)).

15  13.   In light of the circumstances set forth in Paragraph 9, above, Plaintiffs

16        have failed to meet their burden of proving, by a preponderance of the

17        evidence, that Defendant Plummer's conduct shocks the conscience.

18        As described above, Defendant Plummer went to the Ascot Apartments

19        with another officer late at night, partly on routine patrol in a high-crime

20        area and partly to investigate an execution-style homicide.  He saw a

21        large group of adult men disperse as soon as the men saw the police

22        officers arrive, and saw and heard one of the men discard what

23        appeared to be and sounded like a firearm.  When Defendant Plummer

24        pursued that man, he heard gunshots fired in the apartment complex

25        and reasonably believed the shots were directed at him and his fellow

26        officer, who also was chasing a suspect.  In the midst of this chaotic

27        scene,  Defendant Plummer encountered Watson crouching near the

28

1  shrubbery next to Building H, touching a dark object at or near his
2  waistline that appeared to be a firearm; the officer identified himself and
3  ordered Watson to "Freeze," but Watson did not obey the command
4  and continued to touch the dark object.  Defendant Plummer
5  reasonably feared for his own life and fired two shots.  Thus, Defendant
6  Plummer faced an escalating situation where he made a snap
7  judgment; he did not act with a purpose to harm unrelated to legitimate
8  law enforcement objectives, that is, the safety of the officers and
9  members of the public.

10

11  **D.    Monell Claim**

12  14.    Plaintiffs bring a claim under Monell v. Department of Social Services,
13         436 U.S. 658, 691 (1978) against the City of San Bernardino.  As
14         Plaintiffs have not established liability under any of their claims
15         pursuant to 42 U.S.C. section 1983, the city cannot be liable under a
16         Monell theory.  See Los Angeles v. Heller, 475 U.S. 796, 799 (1994).
17         Accordingly, Defendant City of San Bernardino is entitled to judgment in
18         its favor on the Monell claim.

19

20  **E.    Claim for Negligence**

21  15.    To establish their claim for negligence, Plaintiffs must prove that (1)
22         Defendant Plummer was negligent; and (2) Defendant Plummer's
23         negligence was a substantial factor in causing Watson's death.[4]  Ann
24  _____

25  [4] Defendants claim, incorrectly, that Plaintiffs' negligence claim
   encompasses a claim for negligent training and supervision.  (See Defs.'
26  Mem. Cont. Law & Fact at 14.)  Plaintiffs' claim for negligence only seeks
   recovery on the theory that "Officer Jonathan Plummer, while acting in the
27  course and scope of his employment as a City police officer, was negligent in
   his use of excessive deadly force against Shawn Watson . . . ."  (Pls.' Mem.
28                                                          (continued...)

14

1 | M. v. Pac. Plaza Shopping Ctr., 6 Cal. 4th 666, 673 (1993) (citing
2 | United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal. 3d 586,
3 | 594 (1970)).   Negligence is defined as "the failure to use reasonable
4 | care to prevent harm to oneself or to others."  Weaver v. Chavez, 113
5 | Cal. App. 4th 1350, 1355-56 (2005).

16.   Where an officer's conduct in shooting a suspect is objectively
reasonable, he cannot be held to have breached the duty to use
reasonable care.  See Brown v. Ransweiler, 171 Cal. App. 4th 516,
528-29 (2009); Hernandez v. City of Pomona, 46 Cal. 4th 501, 513-14
(2009).  As discussed above, Defendant Plummer's actions were
objectively reasonable, and hence Plaintiffs' negligence claim fails.

**F.   Claim for Battery**

17.   In order to establish their claim for battery, Plaintiffs must prove:  (1)
Defendant Plummer intentionally performed an act that resulted in a
harmful or offensive contact with Watson's person; (2) Watson did not
consent to the contact; and (3) the harmful or offensive contact caused
injury, damage, loss or harm to Plaintiffs.  Brown, 171 Cal. App. 4th at
526-27.  In addition, when suing a law enforcement officer, a plaintiff
"must prove that the peace officer's use of force was unreasonable"
because "[a] state law battery claim is a counterpart to a federal claim
of excessive use of force."  Id. at 527.  Thus, as Plaintiffs have   failed
to meet their burden of proving that Defendant Plummer's use of force

---

[4](...continued)
Cont. Fact & Law at 7).

1  was unreasonable, see paragraph 9 above, their claim for battery

2  likewise fails.

3

4

5

6  Dated:  _January 28, 2011

7                                                    VIRGINIA A. PHILLIPS
                                                   UNITED STATES DISTRICT
8  JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28